Clause number 22-11070. All right. Is the appellant ready to proceed? Yes, Your Honor. We're ready to begin. Mr. Aries. You may proceed. This is a first-party insurance case that requires this Court to make an eerie guess about how the Texas Supreme Court would construe remedial provisions set out in the Texas Prompt Payment of Claims Act. Court is aware, I'm sure, of the supplemental authority filed by Safeco in this case, the Rosales opinion out of the Fifth District Court of Appeals in Dallas that was just decided in the insurer's favor within the last couple of weeks. Our firm represents the insured in that case, and I argued the case to the Court. It's the first case involving this issue to be decided by a Texas intermediate appellate court. I would point out first that we do intend to seek rehearing and or en banc review, particularly given that there was a dissent in the three-judge panel and that federal district courts remain split on this issue. If you are unsuccessful in that, if you are unsuccessful in the potential rehearing, where are we today? If we're unsuccessful in Rosales? Well, we believe that under, first of all, Rosales is not binding on this Court. It certainly can be persuasive, but it's not binding on this Court. This Court has to look at what the Texas Supreme Court would do, and I want to talk today about the legislative history and the legislative intent behind the statutes that we're here about and how we believe that the Supreme Court would address this issue. But to make an eerie guess that the Texas Supreme Court would reverse it, that's pretty tough. It is, but alternatively, Your Honor, we would respectfully suggest that if the Court doesn't feel like the current precedent supports a finding in our favor or doesn't support a finding one way or the other, that certainly certification of the statutory interpretation question to the Texas Supreme Court would be appropriate, given there's not only the Rosales case. There are several other cases currently . . . Can we just wait to hold this in advance so we can see whether you prevail? That would certainly be one approach to take. The alternative would be for us to certify the question to the Court. Why should we certify the case? Would you have a petition before you hear it and ask the Court to take it directly? And that certainly would be one approach the Court could take. The Court has done that in a similar case with the Shin case that our firm also had involving another first-party insurance issue. So that would certainly be one way to address it. There are several other cases currently in the intermediate courts of appeal that we expect will be decided, and there may be a clear split or there may not, but we certainly would offer that as . . . the certification as a solution, but abeyance would certainly also be an option. So I just want to be clear. This case that you have where you're asking for review on in Texas State Court, it deals squarely with the issue that you have before us today? It is factually . . . it's factually distinguishable, but essentially the statutory . . . So I guess what I'm getting at is, so if you don't prevail in that case, you'll concede this case? Oh, no. Absolutely not. Okay. Absolutely not. The decision in Rosales even should not . . . But if you win in that case . . . I'm sorry. If we prevail . . . If you win in that case, you argue that that's the one that should guide what we do in this case. And I'm sorry. I may have misunderstood your question. I was thinking if we prevail on rehearing or en banc review, certainly if the Texas Supreme Court decides the case, the statutory interpretation issue not in our favor, that will be . . . that will indicate what the result of this case should be. Okay. But the Dallas Court of Appeals, if we're not successful in the Dallas Court of Appeals, we would not concede the issue in this case. I'm sorry. I misunderstood your question. I would like to focus the argument today on what we perceive to be entrenched error in the way that the insurers and some of the courts that are siding with them in these cases are characterizing the legislature's intent in enacting the relevant statute. Now, as its name implies, the clear and unequivocal purpose of the Prompt Payment Act is, within the statute itself, it's right there in black and white, is to promote the prompt payment of insurance claims. The statute explicitly provides that it's to be liberally construed to achieve that purpose. And the key section of the Prompt Payment Act in this case is 542.060, which is entitled Liability for Violation of Subchapter. That 542.060 subsection A has been on the books for decades, and it provides that when an insurer is liable on a claim and has violated one of the Prompt Payment Act's claims handling or payment deadlines, it has to pay the insured, in addition to the claim, 18 percent penalty interest plus attorney's fees. In 2017, the Texas legislature passed legislation that did two things. The first thing it did was it amended the existing Prompt Payment Act, amended section 542.060 to add a new subsection, subsection C, which is essentially identical to subsection A that I just talked about, except that it sets the interest rate in cases to which Chapter 542A of the Insurance Code applies, which I'll talk about in just a minute, to instead of the 18 percent penalty interest amount, to prime plus 5 percent, subject to some limitations. And the effect of that is that instead of the static 18 percent penalty interest rate, the interest rate in 542A cases will fluctuate and could be anywhere from 10 to 20 percent. It's currently sitting at 13 and a quarter. But when this case was initiated, I mean, a lot when the statute was enacted and until very, very recently, within the last eight months or so, it had kind of hovered right at 10 percent. And that brings us to the second thing that the 2017 legislation did. It added Chapter 542A. By its terms, 542A applies to weather-related first-party cases, and it's undisputed that it applies in this case. 542A says that in any weather-related first-party case, a pre-suit notice has to be sent that does certain things. It has to set out the factual basis for the claim, the specific amount that's alleged to be owed for property damage, and the amount of attorney's fees that are incurred to date. And this is important because that language in the statute shows that the legislature specifically contemplated that an insured will be represented by counsel, will have retained counsel, even at this very early pre-suit notice stage. If the pre-suit notice doesn't meet those requirements, your case can be abated until you provide proper notice, and if the notice doesn't include the specific amount alleged to be owed on the claim, then the statute takes it even a step further and says, if the insurer pleads and proves that, you don't get your attorney's fees after that point. 542 also provides a rubric for calculating fees that ties them to the amount in that pre-suit notice letter. It says that fees are the lesser of what you prove up at trial, what you're entitled to under another statute, or the amount calculated by dividing the amount to be awarded in the judgment for property damage by the amount in that mandatory pre-suit notice. Now, a basic canon of statutory construction is that a court, considering a Texas statute, tries to ascertain the legislative intent. Unlike the Prompt Payment Act, which is very clear about its purpose in the body of the statute itself, 542A does not specifically state its intent. SAFCO says on page 19 of its brief, with no citation to the statute, legislative history, or anything, quote, the fundamental purpose of the bill was to disincentivize attorneys from filing weather-related insurance coverage cases like this one by making them less lucrative. SAFCO's briefing also quotes several courts who have said things like 542A was intended to substantially limit attorney's fees in these cases, or 542A was intended to limit damages in storm damage cases. Herein lies the entrenched error that has developed in some of the case law. Courts that have interpreted 542A this way, as intending to substantially limit fees in all of these cases, or substantially limit the types of damages that are available, they're not saying that based on the language of the statute or the legislative history. I read the statute. It looked to me like the legislature was trying to address a situation where the attorneys are demanding, on the first demand, coming in after the storm and making a very high demand. And they said to get realistic about it, okay, when you make those kind of demands, we're going to, they're going to come back to haunt you if you're not successful in your claim. And that's exactly what it was intended to do. And if we look at the bill analysis, which is cited in, I believe, in both parties' briefing. Why are you, what's, where has that gone wrong? Well, it's gone wrong in that the insurance companies are now using that by virtue of the language in 542A.007, which provides this rubric that talks about dividing the amount to be awarded in the judgment by the amount that's in that pre-suit notice letter. They're saying, well, we've paid the interest that we would owe you, so we can, there can never be anything awarded, and so it has to be zero. But if we look at the legislative history, again, there's nothing in the statute itself, like there is in the Prompt Payment Act, about the statute's intended purpose. But if we look at the legislative history, and we have a bill analysis from the House Committee of the House bill that is very clear about what the intent was. It says that this bill would mitigate the growing trend of abusive, key word, abusive severe weather event lawsuits, and it goes on to say, opportunistic lawyers have been using extreme weather events as a pretext for exaggerating damages, suing innocent parties, and failing to give notice to insurers before filing lawsuits. It goes on to say that the legislation would not, was not intended to affect the rights of policyholders to sue their insurers, it, quote, simply would create penalties to enforce the existing pre-suit notice requirement. And you touched on exactly what the purpose was. Lawyers were sending out these outrageous pre-suit notice letters, characterizing it as a demand at an outrageous amount, and then the actual amount that ends up being owed is much less, and so the purpose of the statute was to address that precise situation that you mentioned. This was always a bill that was first and foremost primarily about notice. In fact, the very first line of the bill analysis identifies the subject of the bill as, quote, requiring pre-suit notice for certain claims against an insurer. And courts that have analyzed the notice provisions in 542A have remarked that the legislature's intent was to give the insurance carrier an opportunity to make a pre-litigation settlement offer and resolve the dispute without going to court. What do you want us to do? Well, let's look at the facts of the case against the backdrop of the purpose of the stated purpose of the legislation, because what SAFCO says is that the legislature intended to wholesale read attorney's fees out of these cases in the appraisal. How does that translate to a ruling by this court? What kind of ruling are you seeking? Well, we're asking the court to reverse the summary judgment on the Prompt Payment Act claim and the claim for attorney's fees. If we could look briefly, I know they're in our briefing, but just briefly looking at the facts of the case against the backdrop of the stated Again, that's the mechanism to reverse the summary judgment blow. On what basis? What's the rationale? What do you want us to say? Well, the interpretation of the statute that SAFCO urges and the interpretation that the district court made is unreasonable. It's not supported by the text of the statute or the text of the legislative history. I'm sorry? So what should we say? What are you asking us to do? Well, we're asking you to find that there is an interpretation of the 2017 legislation that can give effect both to the Prompt Payment Act's stated purpose, which is to promote the prompt payment of claims and doesn't alter its nature as a strict liability statute, which it's undisputed that it's a strict liability statute, and also gives effect to 542A's actual legislative intent, which was to promote pre-suit notice and allow these cases to have a chance of being resolved pre-litigation. That interpretation is the one that's advanced by Judges Garcia, Ellison, Palermo, and Ferrer in the cases that we've discussed in our briefing in detail. That's the construction that we're asking the court to adopt. We're asking the court to adopt a more reasonable construction that gives effect to both the Prompt Payment Act, which it often falls by the wayside in this discussion, that the legislation in 2017 didn't just create 542A. It also amended the Prompt Payment Act, and the legislature had every opportunity to say, oh, well, we think in these appraisal cases they shouldn't get attorney's fees. That's not the purpose in these cases. They didn't amend the purpose of the Prompt Payment Act. The purpose of the act stays the same, and it's a strict liability statute, and it could not be more clear that if the insurer violates the act and is liable for the claim, then they're bound to pay interest and attorney's fees. This case, and this is where the facts are somewhat different from the Rosales case that we talked about a little bit earlier. Back in 2019, Mr. Rodriguez's home is damaged. Safeco accepts the claim, but finds only $1,300 in damage. Safeco goes out and hires an engineer that says, oh, yeah, we don't think there was an EF2 tornado. This was a smaller storm that couldn't possibly have caused this much damage. It's discussed in our briefing that that was just blatantly false, it was just misrepresentations. In April of 2020, Mr. Rodriguez hired counsel and sent the pre-suit notice letter just like he was supposed to do under the statute. The specific amount that he alleged to be owed for the damage to his property was an additional $29,500 in addition to what had been paid. Safeco got that letter in April of 2020 and did not respond. They didn't exercise the statutory right they have under 542A to do some additional investigation or inspection of the property. They didn't request any information from Mr. Rodriguez or his counsel about why do you think you're owed these additional monies. They didn't make a settlement offer in an effort to avoid litigation. They didn't do anything. What they did do is once Mr. Rodriguez was forced to file suit because he was having no luck any other way, is they vigorously litigated the case for one year in the federal district court and then only after a year passed, they invoked appraisal. Eight months later, we're now three years after the storm, eight months later, the appraisal award comes back 28 times Safeco's initial estimate and 25% higher than what Mr. Rodriguez put in his notice letter back in May of 2020. So he did exactly what he was supposed to do. Safeco, however, says that the result in this case, which is that Mr. Rodriguez is left with no ability to recover attorney's fees despite having had no option because Safeco wasn't paying him, that that's the result the legislature intended. And if the court looks at that bill analysis, it just is not there. I see that my time has expired. If the court has any, has no further questions, I'll be back for rebuttal. You reserve time for rebuttal. Yes, Your Honor. Mr. Tillman. You may proceed. Thank you, Your Honors. May it please the court. Mark Tillman on behalf of Safeco Insurance Company of Indiana. I do think it's important to look at the history of this statute. Back in 2017, Governor Greg Abbott, in his state of the state address, talked about a of property damage lawsuits in Texas, which had increased by around 1,400% over a five-year period. It was determined that those lawsuits were largely driven by attorneys that were the ones primarily profiting from this huge increase in litigation. And so that's when House Bill 1774 was introduced and passed. It went into effect September 1st, 2017, and it did several things. Number one, it did not do away with the prompt payment of claim statute. In fact, in this case, Safeco paid over $9,500, or roughly $9,500 in interest, penalty interest, under the statute because, under the Barber Technologies case, it was determined that you can't just demand appraisal and then go pay the appraisal award and be off the hook scot-free. Barber Tech was an important case. It changed the law on appraisal significantly, and so now carriers do have to pay interest. The question is with regard to attorney's fees, and that's what this case is about. But what the new 542A did is it did provide a mechanism whereby you could significantly limit or do away with entirely attorney's fees under certain circumstances. Not all circumstances, but certain circumstances. Ms. Ray referenced one, if an attorney fails to send out the pre-suit notice that is required. Under the old 542, before 542A, there was really no teeth in that statute. You were supposed to send it out, but if you did, the only thing you could do in response was file a plea and abatement, which required the attorney to then send out the notice and the case would be abated for a limited period of time. Really wasn't that punitive, and so what 542A did, it added some teeth. It said no. If you don't send out that pre-suit notice and you file suit before the 61 days, then the defendant has the ability to file a motion and ask that their attorney's fees, they don't get their attorney's fees after that motion is filed. 542A had a second mechanism, and it's the one we're talking about today, 542-007, which set forth a formula, and this is the one I believe one of your honors just referenced, that if you demand too much and what you're actually awarded is well below that amount, then your attorney's fees can be reduced or even eliminated. In other words, if you demanded $100,000 but only recovered $10,000, that's less than the 20%, you don't get your attorney's fees at all, and so this was the specific aim of the legislature, was to curb these lawsuits by hitting the attorneys, frankly. But that's not what happened here. That is not what happened here. What happened here was an appraisal award was entered, and insurance carriers have a choice when they get an appraisal award, because Barber Technologies, although it said that the appraisal award does fix the amount of the loss, it does not determine liability, and so BarberTech came out, and those of us on this side of the bar in this world kind of wondered, what do we do with these cases? Because on the one hand, we can go and still try it, try the liability, but the jury's obviously going to already hear that there's been this appraisal award determining the amount of loss, and so oftentimes, even if the insurance carrier doesn't necessarily agree with the appraisal award, it's oftentimes better just to pay it, and that's what we see happening in a lot of these cases. There's appraisal awards are difficult to challenge, and once you have this looming appraisal award, it's also, you can imagine, it's a difficult case to try up against that. And so oftentimes, as happened in this case, even when the carrier doesn't necessarily agree with the award, they have the option of paying it. But that's what happened here. But that process is not a requirement, is it? I'm sorry, Your Honor? Do you have to do the appraisal award? Do you, if it's demanded, yes. If it's what? If it's demanded. If either side demands appraisal, then courts are very strict in enforcing that appraisal provision. Both sides have to go to appraisal, they have to pay their own size. If either side demands it, then it has to occur. For the most part. I'm not going to say 100% of the time. There are some rare exceptions, but going back 200 years, courts in Texas have held, including the Supreme Court, appraisal clauses are to be strictly enforced. And so either side can demand it, and both sides do demand it. And especially after barbertaking. That's not it. The insurance man comes out and looks at the property and says that $10,000 will take care of this. And then they would look at the end of the game, and they say it's $80,000. As I see these cases, sometimes there are wide variations in that initial insurance company comes out, and this is what it's about. So the insurance company, if that's happening with frequency, and I don't assert that it is, but my impression is that, I get from my limited vision of it, and if that's so, that really is also a large contributing factor to this whole phenomenon. Why they need lawyers, you've got to hire a lawyer, because the guy's going to come out and ask you $10,000 when it's obviously $50,000 damage. Correct. Help me with that. Well, that does happen oftentimes, Your Honor. I don't think your perception is incorrect in that. But oftentimes the appraisal awards are also much higher. From my perspective, they're oftentimes much higher. Sometimes it's a jackpot, which is why you often see plaintiffs now, especially since Barbaratech, plaintiffs are demanding appraisal every bit as much as insurance companies are. And the thing that Barbaratech did, and again, even on my side of the bar representing insurance carriers, I understood that it wasn't necessarily fair that you could refuse to pay a claim, go for several years, litigate it, and then demand appraisal, get an award, pay it, and then king's X, you're off the hook. I understood that that was not fair. And so Barbaratech came along and said, no, the prompt payment statute still applies. Now, granted, Barbaratech's not a 542A case, but it still stands for the proposition . . . You have to pay interest on it. You still have to pay interest. And had Safeco decided not to pay this appraisal award, had they decided to go and litigate it and fight about it, they would potentially be liable for attorney's fees as well. But the interest in the concept compensates them. But it also, that lower award, that lower appraisal, forces them to get counsel. I'm sorry? You've got a person out there, and the roof's been blown off his house like everybody else, and he calls the insurance company. They come out. He doesn't have a lawyer. And he writes him up in a note and says, you know, it's $10,000. And he knows it's much, much higher than that. I don't know what frequency that happens. But when it does happen, then the homeowner's just got nothing else they can do but to hire a lawyer. And most people can't afford a lawyer, unless they've got it on some contingency basis, et cetera, et cetera, unless it's built into it. They can't pay it. Those fees are going to cost them more than repairs. And I'd say two comments, Your Honor. First off, they don't always hire a lawyer. Oftentimes, I've seen appraisals. There's a lot of public adjusters in Texas, which, as you know, are adjusters who work on the policyholder side. We often get or see demands for appraisal from public adjusters. You don't even have attorney's fees involved. There are no reasonable attorney's fees, because there's no attorney been hired. And I can't remember what my brilliant second point was going to be, but the first one is you don't necessarily have to hire a lawyer just to demand appraisal, and we see it all the time where it doesn't happen. So you started off talking about the policy justifications for the changes in the statute and why the attorney's fees were being curbed, and the first example you gave is for people who do not send out pre-suit notices, and then the second example you gave was for people who request too much. But those both seem like sort of not necessarily clean hands on the hands of the insured. That's not what this situation is. Here, according to opposing counsel, the appraisal came back, I think she said, 25, 28 percent higher than what the insured had notified in the pre-suit notice. So it seems like the insured did everything that they were supposed to do here. So I don't see how that falls in line with the policy justifications that you mentioned at the outset. Well, and I can see your concern on that. The problem is the way the statute is written, and counsel has talked about we have other interpretations of how the statute should be read, but I have really yet to see how they're reading the statute. The statute, if you read it, is very clear, and what it says is the way you calculate your attorney's fees is by dividing the amount to be awarded in the judgment to the claimant for the claimant's claim under the insurance policy for damages to or loss of covered property. You divide that amount by what was demanded. Well, the problem is the way the statute is written, and frankly, the only way I believe it can be read fairly is if you've already paid the amount of the claim, which is what's happened here. Safeco paid the amount of the claim. Let's not even talk about the interest. They paid the amount of the claim. So there is that top number, the numerator, is zero, which means no matter what it's divided by, if you do the math, it's always going to be zero. So then I can understand you saying that your argument sort of falls on the plain language of the statute. I don't understand how it falls on the justifications behind those changes. If you're going a step beyond, if you feel like we need to have some discussion or consideration of the policy justifications, then I think I'm having a hard time making that connection. I was more addressing counsel's policy argument. Frankly, policy, public policy is not something this court should be doing when looking at a statute. First and foremost, what this court should be doing is reading the statute and seeing if it's a plain language statute and if there's a plain interpretation. The context of public policy is simply to get a sense of what you're trying to do, what you're saying, and that's the context in which we will interpret the statute. We're not going to set the policy, but we need to know what this market is, so to speak. Sure. What's the dynamic? What's really going out there on the ground? Well, all I'm saying is to argue as plaintiff's counsel, or I'm sorry, as appellant's counsel has done, that it's ludicrous that the legislature intended to remove attorney's fees with 542A. First of all, that's not worth saying because you still can get your attorney's fees under 542A in plenty of circumstances. What I'm saying is the legislature clearly intended to set forth situations where attorney's fees would not be recoverable. And I do recognize that this is a slightly different situation because, as you said, this is kind of more of a clean hand. This isn't a situation where they necessarily demanded some massive amount or failed to send out their pre-suit notice. Both of those things happened. However, by choosing to pay the amount of the claim, SAFCO basically zeroed out any ability for them to obtain a judgment. And therefore, the only additional thing they have entitlement to under the prompt payment claim is their interest. And keep in mind, this was about a $30,000 claim at the end of the day, and they received $9,500 of interest. So it's not an insignificant amount of interest when you consider the size of the claim. And the fact is the interpretation being promoted by SAFCO here is the one that's been adopted by every federal court over the last two years. There were a couple of opinions in 2020-2021 that are frankly outliers that have been disregarded for the most part. Gonzales is one of the big opinions that was argued by appellant. That case, though, there was really no precedent. And so that was one of the judge's big issues. He also considered the policy arguments. But since that time, all four districts in Texas have issued multiple opinions. And the Rosales opinion that we just talked about that came out last week, that's the first Texas appellate court opinion that has come out on this issue. It is on all fours. And it does a fantastic job of going through and explaining every, or not every, but the vast majority of the federal courts' status in that case. Now, well, I just heard it just as you did, Your Honor, just now. That was not my case. I've just read the opinion. In fact, I don't even, I didn't even see that there was a dissent. It's not in the copy of the version I had. They're saying that they're going to appeal or take it up, but I've not seen that. Another very important case that I think this court should consider, we filed, this issue is trendy, we filed two different letters asking for you to consider additional authority because three new cases came out since we filed our brief. Two of those cases, Rosales and a case called Morakabian, were both handled by the same counsel that is handling the appeal in this case. And I think it's important to read those cases because the arguments made, the briefing is virtually identical. And in Morakabian in particular, Judge Jordan said that the argument that they are making is, quote, far-fetched, and he says, Morakabian makes the, quote, far-fetched argument that regardless of, quote, how much money Allstate tendered, offered, or paid, and regardless of what Allstate called it, Morakabian would still have a cognizable TPPCA claim for interest. Well, if you just remove Allstate and put Safeco, that's on page 30 of their brief in this case. It's the same briefing. They're making the same arguments, and frankly, all the courts that are considering the same argument are siding on our side of it. If you read the statute by its plain terms, it's a mathematical formulation, and any way you slice it, if you do the math, it comes out to zero. The only other thing, so first off, we're asking that the court affirm the summary judgment which said, by paying the appraisal award and all conceivable interest, and they haven't We did satisfy their TPPCA claim and were entitled to summary judgment. That was a correct decision by the district court. But second of all, based on the formula under the statute, by its plain terms, they aren't entitled to attorney's fees, and then the third point that we're asking the court to affirm is their claims under 541. I don't think counsel said anything about that, but I'm sure your honors are familiar with the independent injury rule in Texas, where unless you have an independent injury, if all policy benefits are paid, you aren't entitled to a claim under Chapter 541, which is a statutory bad faith statute. The only independent injury they've claimed here is the money they paid for their appraisal costs, because both sides, according to the contract, have to pay that. Courts have routinely rejected that argument. We've cited the cases in our brief. Under Menchaca, the independent injury cannot flow from or stem from the claim for policy benefits. Clearly, a claim for the appraisal costs, which are to get your policy benefits, that's much akin to attorney's fees, which Ortiz said is not an independent injury. The Gonzales case? Give me an example of an independent injury. Well, your honor, the Supreme Court has said they've yet to see one. They have said that at this point, it's a hypothetical thing, and to this point in time, no one has found one. So it's kind of like a, well, I don't know what it's like, Bigfoot maybe. You maybe know what he looks like, but no one's seen him yet. So that's what the status of independent injury is in Texas. I'm not aware of one that has been found yet. And certainly, though appraisal costs have been held specifically under the Gonzales case on the Southern District, has held that that is not an independent injury as a matter of law. So unless you have any other questions, your honors, I will be done. Thank you, counsel. All right. Thank you, your honors. Votto? The language in 542A.007 is important because it doesn't say, doesn't necessarily contemplate that there will be a judgment with property, with policy benefits for property damage awarded. It says the amount to be awarded in the judgment. It doesn't say the amount that is ultimately awarded or the amount that is awarded in the And certainly a reasonable interpretation of the statute is exactly what Judge Ellison told us in his well-reasoned opinion in Martinez, that it contemplates an offset by monies that were already paid by the insurance company during the pendency of the litigation, this gratuitous interest payment that the insurance company makes, or the payment of the appraisal award. We also know from Barber Technologies, which was not a 542A.00 case, but certainly was decided when 542A.00 was already... When you say gratuitous interest payment, what do you mean? What the insurers do is they, when they pay the appraisal award, they send a check and say, we're sending you this check and this is for any interest you could possibly be allowed to be, be alleged to be owed. The first problem with that is if you look at the statute at 542.060C, it says they owe interest calculated at the time of a judgment. We know from the statute that that amount fluctuates. So at the time that Safeco paid this award, the interest rate was 10%. It's now 13.25%. Well, I guess it's just the use of the word gratuitous. I mean, the statute provides for it. It does, but there are no damages until there's been an adjudication of liability. I understand that, but it provides for the payment of interest, and what they're doing is... Correct. And gratuitous may not be the... It's probably not the most artful word. Essentially, they're writing this check and saying, here, we're going to call this an interest payment. Our position is they can write us as many checks as they want to for whatever the amount. We're not agreeing to compromise that claim. They can't... And that's exactly what Judge Ellison and some of the other courts looked at. You don't get to say, well, I wrote you a check, and so therefore, you've compromised your claim. There's nothing else that you can recover. That's something that's left to be adjudicated, and I think the statutory language in 542-060C contemplates that when it says, at the time of the judgment, that interest is to be calculated at the time of the judgment. They don't say at the time the payment is made. They don't say at the time that the claim was filed. They say at the time of the judgment. That shows... You had the use of the money in that interim, so... I'm sorry? You had the use of that money in the interim. So you... They say they paid it too soon, and I don't want to accept that. I want the interest rate later. Well... Well, not that... It's not, Judge, that they paid the... You had the use of the money, so you... And it's not that we're arguing they paid it too soon. We're arguing that they can't force us to compromise our claim by making this payment and saying, this is everything that you're owed. That's not up to them. So that language, to be awarded in the judgment, I think certainly contemplates a reasonable construction that would... That would contemplate an offset or a credit for any payment that has been made at the time of trial. We're not saying we get to take a judgment for the amount of the appraisal award that's already been paid. We're saying that's something the court takes into consideration in determining attorney's fees. And in Barber Technologies, which was not a 542A case, but was decided after the 2017 legislation was... Had been enacted, the court leaves open the possibility that the amount paid pursuant to an appraisal award can represent actual damages for the purpose of evaluating liability under the Prompt Payment Act, assuming that the insurance company is ultimately found to have been liable on the claim. I mean, that was... That was a key point in Barber Technologies. So that's where... That's where we have a reasonable interpretation that allows us to harmonize both 542A and the limitation of attorney's fees in some cases, and the stated purpose of 542-060 in the Prompt Payment Act, which is to encourage the prompt payment of attorney's fees. I mean, it's clear from the legislative history... Let's circle back to what we do, given the opinion is there, and you're obviously contemplating pursuing it. They... What should we do to wait and find out? Well, Your Honor, we would urge that the court either certify the question or abeyance would also be... I mean, that's something the court's done before in a similar situation, so we certainly would be okay with that. The last thing, if I may briefly conclude, is what is clear from the bill analysis is that the legislature intended to curb abusive lawsuits, abusive. Where is the abuse here? There is none. Mr. Rodriguez did everything he was supposed to do. Thank you. Thank you, counsel. The court will take this matter under advisement. This concludes the cases that are on today's docket.